**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

A.J. ADAMS,                              )
                                         )
            Plaintiff,                   )         Case No.  1:07-cv-316-SJM
      v.                                 )
                                         )
THE COUNTY OF ERIE,                      )
PENNSYLVANIA, *et al.,*                  )
                                         )
            Defendants.                  )

**<u>MEMORANDUM OPINION</u>**

McLAUGHLIN, SEAN J., District J.,

      Plaintiff A.J. Adams has brought this civil rights action against the County of Erie, Pennsylvania, Mark A. DiVecchio, Anthony A. Logue, and David C. Agresti, claiming that his federal constitutional rights were violated when he was unlawfully terminated from his position as the County's First Assistant Public Defender following DiVecchio's election to the office of County Executive.  This Court's subject matter jurisdiction is premised upon 28 U.S.C. § 1331 and 1343(a).

      Presently pending before the Court is the Defendants' motion for summary judgment.  For the reasons discussed below, the motion will be granted.

## I.      STANDARD OF REVIEW

      Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  When adjudicating a motion for summary judgment under

1

Fed. R. Civ. P. 56, we must "view all evidence and draw all inferences in the light most favorable to the non-moving party." *Startzell v. City of Phila.*, 533 F.3d 183, 192 (3d Cir. 2008). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Consistent with this standard of review, we set forth the relevant background facts. The following facts either are undisputed or, where disputed, will be construed in the light most favorable to Adams.

## II.   BACKGROUND FACTS

Adams is an attorney and a member of the Pennsylvania Bar who served in the Erie County Public Defender's Office from 1987 through January 13, 2006, when his employment was terminated. In June of 1988 he became the First Assistant Public Defender and remained in that capacity until the time of his discharge.

During his tenure in the Public Defender's office, Adams served under both Democratic and Republican County Executives and several different Chief Public Defenders, mostly without incident. Brad Foulk, who was the Erie County District Attorney during the time period giving rise to this action, opined that Adams is "a very competent, good lawyer." (Foulk Depo. [57-11] at 22.)[1] At all times relevant to this action, Adams was, and still is, a registered Democrat.

Defendant DiVecchio is a member of the Democratic Party who, in November of 2005, was elected to the office of Erie County Executive following a close election in

---

[1] Our citations to the deposition transcripts herein will refer to the original pagination located internally within the referenced document rather than to the official CM/ECF pagination located at the top of the document.

which DiVecchio narrowly defeated his Republican challenger, Dale McBrier.  DiVecchio assumed office as County Executive on January 2, 2006, replacing Republican Rick Schenker.  Defendants Logue and Agresti are both Erie County attorneys who supported the DiVecchio campaign in various capacities and who later went on to accept employment within the county government under DiVecchio's administration.

Initially, the general election results showed McBrier winning by only six votes.  A recount was then held, after which the results showed DiVecchio winning the election by 121 votes.  The election board was comprised of those members of the Erie County Council who were not running for office.  Logue, a Democrat who was then employed as the Solicitor for the Erie County Council, was present for the recount in his (dual) capacity as solicitor for the County Election Board.  Also present during the recount was Agresti, a registered Republican who had supported DiVecchio during the general election and who was then serving as DiVecchio's private legal counsel relative to election and recount matters.

### a)  Logue's Appointment as Chief Public Defender and Adams's Termination

Following the 2005 election, Logue was appointed by DiVecchio to the office of Chief Public Defender for Erie County, replacing the existing Chief Public Defender, Christine Konzel.  Logue had long desired to become the Chief Public Defendant for Erie County, and he admits to having expressed this desire to DiVecchio even prior to the 2005 primary election.

In November of 2005, after prevailing in the general election recount, DiVecchio informed Logue that he was going to appoint him Chief Public Defender.  According to

DiVecchio, this occurred following a luncheon which the two attended at the Oakwood Café, the details of which will be discussed in more detail *infra*.

Meanwhile, Logue had decided that, if he were appointed as Chief Public Defender, he would select Attorney Jim Pitonyak as the First Assistant Public Defender, a move that would necessarily displace Adams.  Pitonyak had first met Logue when Pitonyak became a newly admitted attorney and Logue was a county probation officer. Logue worked in the same private law practice with Pitonyak for a year or two in the late 1980s or early 1990s.  Pitonyak and Logue had also worked on civil and criminal cases as co-counsel.  In 1992, Pitonyak had recommended Logue to Michael Palmissano, then the Chief Public Defender, for a position as a part-time assistant public defender. Thus, sometime in or around late November, after DiVecchio had won the election and had offered Logue the job of Chief Public Defender, Logue approached Pitonyak and offered to make him the First Assistant Public Defender.  (Pitonyak Depo. [57-6] at 48, 52.)

Notwithstanding his intention to make Pitonyak the First Assistant Public Defender, Logue contends that it was also his intention to keep Adams in the office, albeit at a lower position.  Logue further claims that he had a conversation with Adams in the county courthouse in late November or early December 2005, wherein he expressed his intention to keep Adams on within the office as a rank-and-file full-time assistant public defender.  According to Logue, Adams used profanity toward him and stated that he would never agree to work for Logue.

4

Adams denies that this conversation ever occurred and claims, in fact, that Logue did not speak to him even once during the entire four years of the Schenker Administration.  In Adams's words,

> [w]hat was going on for a significant period of years is Mr. Logue's desire to be the chief public defender.  He had even crossed party lines to support Mr. Shanker [sic], the [R]epublican, because he believed that he had a deal cut where if he gave Mr. Shanker [sic] the [R]epublican his [D]emocratic support that he would, in fact, become the chief public defender.
>
> Unfortunately, when that decision was made, Mr. Shanker [sic] decided to go continuing with Ms. Konzel who was appointed initially by Judy Lynch who[m] Mr. Shanker [sic] defeated in the county executive race [of 2001].
>
> Since that time or even perhaps prior to that time, because Mr. Logue saw me as the logical chief public defender because I had been working as a public defender longer, I had been a lawyer a lot longer, I have a much better legal reputation than he does, that, in fact, he saw me as the number one person that is in his way of obtaining a job that he had since gotten and subsequently altered to his financial betterment.
>
> …
>
> He's not only eliminating a competitor, he is replacing the competitor with someone [i.e, Pitonyak] that he has a remarkably close personal relationship with.

(Adams Depo. [62-2] at 256-58.)

In any event, by correspondence dated December 30, 2005, Adams was fired, along with two other full-time assistant public defenders – Andrew Weinraub and Keith Clelland.  Adams's termination letter, which was drafted by Agresti and signed by both Logue and DiVecchio, did not give any particular reason for his firing but instead stated (in relevant part) as follows:

> Dear Atty. Adams,
>
> Please allow this letter to inform you that your service to the county, as 1st Assistant Public Defender, will not be needed after Friday, January 13, 2006.  While on County Council for the past four years, I have worked

5

with the Public Defender's Office on many occasions.  Your service has
been greatly appreciated.

***

On behalf of me, the incoming administration, and the citizens of
Erie County, thank you for your dedication and service.  I wish you the
very best in your future endeavors. …

(Adams Depo. Ex. 17, Doc. No. 62-5 at p. 18.)  Among the new assistant public

defenders hired by Logue and DiVecchio were Ian Murray, a longtime local Democratic

figure, and John Moore, an attorney who had rented office space in the Agresti family's

law firm.

### b)  The Alleged "Macing" of Adams by Laurie Rogan

On two separate occasions in or around September and December of 2005,

Adams was approached by Laurie Rogan, an investigator in the Public Defender's office

who was also serving as the Treasurer for one of DiVecchio's fund-raising committees.

According to Adams, he was asked by Rogan on these occasions to buy tickets to

fundraising events benefitting the DiVecchio campaign.  Privately, Adams was reluctant

to support DiVecchio and considered Rogan's request to be a "macing" – a term which

Adams defines as "the practice of pressuring government employees to contribute to

political campaigns."  (Pl.'s Statement of Material Facts [61] at ¶ 60, p. 10.)

Nevertheless, Adams did purchase the tickets.  On September 24, 2005, Adams

wrote a check in the amount of $50 toward purchasing a ticket to an outdoor breakfast.

On December 16, 2005, Adams wrote a check in the amount of $100 for a ticket to

DiVecchio's inaugural ball.  Adams did not attend either event.

Despite feeling that he was being "maced," Adams did not object either to Rogan

or anyone else about making the contributions, because he felt it would not be in his

6

interest to be perceived as unsupportive of DiVecchio.  Adams was close to his 20-year mark as a county employee, a milestone which would have entitled him to a full pension upon retirement.  He states that, by making his campaign contribution, "I was hoping I was buying enough time so that I could at least get my 20 years of service in so that I would be able to have a full pension if, in fact, the time came when I got terminated." (Adams Depo. [63-2] at p. 330.)  In order to document this perceived macing, however, Adams made the checks out to Rogan personally rather than writing them to DiVecchio's campaign committee.

### c)  Agresti and the Formation of a Transition Team

Following DiVecchio's success in the general election, DiVecchio approached Agresti about serving on, and helping to assemble, a transition team.  Agresti contacted Foulk (then the District Attorney of Erie County and a fellow Republican) and local businessman Owen McCormick about forming the team.  A number of other individuals active in the local community were also asked to be on the transition team, including Joyce Savocchio, the former Mayor of the City of Erie, and Wally Knox, a local attorney and former city solicitor.

Of particular concern to the DiVecchio Administration was the need to fill the positions of County Solicitor, Personnel Director, and Finance Director.  The transition team assisted in recommending individuals who might be suitable candidates for these positions.  Soon after joining the transition team, Wally Knox assumed the job of County Solicitor.  Local attorney Larry Meredith ultimately became Personnel Director after the original appointee had a sudden change of heart and declined the position.  An individual by the name of Tom Lyons, who had served as Finance Director under the

Schenker Administration, was initially kept on in that position but was replaced by a young woman named Stephanie Freeman.

In addition to co-chairing the transition team, Agresti was appointed by DiVecchio as an assistant solicitor for the Erie County Office of Children and Youth.  Ines Massella, an assistant public defender and chair of the local Women's Democratic Caucus, was selected by DiVecchio to serve as the chief solicitor for OCY.  In the course of these personnel changes, Attorneys Michael Cauley, Ken Zak, and Catherine Allgeier -- all of whom had worked in the Office of Children and Youth under the Schenker Administration -- were terminated from their employment.

### d)  Adams's "Pay-to-Play" Theory

Adams claims that these personnel changes, including his own replacement by Pitonyak as First Assistant Public Defender, were part of a larger pattern of a "pay-to-play" scheme whereby individuals holding non-elected, non-union jobs who failed to support the DiVecchio campaign were terminated and individuals who did support the DiVecchio campaign were awarded those jobs.  More specifically, Adams contends that those individuals who contributed $500 dollars or more were generally allowed to keep their jobs or were appointed to open positions, whereas individuals who contributed less, or nothing at all, were denied employment or were terminated.

As support for this theory, Adams asks this Court to consider the alleged "macing" he endured and the various county jobs which were turned over to new employees in the public defender's office, the Office of Children and Youth, and other departments as well.  Adams posits that those individuals fired from their jobs were performing their jobs well and that the terminations were not "for cause" but for political

8

reasons.  Further, Adams contends that the normal process of advertising open

positions was not followed with respect to the job openings created by the incoming

DiVecchio administration; instead, he claims, the open positions were summarily filled

by DiVecchio supporters as a reward for their political allegiance.

As additional support for his theory, Adams points to the affidavit of State Police

Trooper Jim Brown, who had a professional encounter with Agresti in the county

courthouse sometime in February or March of 2006.  During this encounter, Trooper

Brown referenced the firings of Adams and Weinraub and inquired, "What's up with

that?"  (Affid. of Jim Brown [65-5] at ¶ 8.)  According to Brown, Agresti responded in a

serious tone and said something to the effect, "Those guys should have known better.

You give $500.00 to each campaign and cover your bases."  (*Id*. at ¶ 9.)

Adams further contends that Agresti made statements to Adams's counsel during

the early stages of this litigation, when it was not yet clear whether (the original) defense

counsel would be authorized to accept service on behalf of Agresti.  According to

Adams' attorney, Agresti expressed irritation at the fact that the county's insurer had not

yet agreed to defend him, stating "Don't they realize all the additional defendants there

should be and I would add?"  (Affid. of William Taggart [65-1] at ¶ 10.)

Adams also relies on statements made by DiVecchio's successor, Barry

Grossman, who became the county executive following the November 2009 election.

Adams asserts that Grossman ran on a promise to, among other things, end political

cronyism and later informed local news agencies that his greatest achievement during

his first 100 days as county executive was ending the use of cronyism in appointing

county officials.  According to Adams, this statement by Grossman is an "admission"

that is binding upon the County in this action.  Adams further posits that Grossman, an attorney and allegedly a scholar in the area of constitutional law, is qualified to express an "expert" opinion as to whether cronyism took place in the removal of himself and other county employees under the DiVecchio Administration.

Based on the foregoing, Adams has asserted that his federal civil rights were violated – specifically, that his firing was premised upon his lack of political activity in violation of the First Amendment to the U.S. Constitution.  While Adams initially asserted other causes of action premised on the alleged violation of his constitutional rights and/or violations of Pennsylvania law, these claims have all essentially been withdrawn or abandoned.[2]  Accordingly, we evaluate the Defendants' pending motion for summary judgment insofar as it relates to the sole remaining claim in this case.

## III.   DISCUSSION

Plaintiff's only claim against the named Defendants is brought under 42 U.S.C. §1983, which provides a cause of action as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…

This statute "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and

---

[2] Adams's Fourth Amended Complaint (the relevant pleading for present purposes) sets forth four causes of action.  Count I asserts a claim under 42 U.S.C. § 1983 premised on the alleged violations of Adams's rights under the First and Fourteenth Amendments.  The alleged First Amendment violations comprise the only claims remaining in the case.  The claims based on the Fourteenth Amendment included alleged violations of Adams' substantive and procedural due process rights, but these claims have been abandoned.  Counts II through IV consisted of claims under Pennsylvania law based on, respectively, alleged breach of contract, tortious interference with a contract, and wrongful discharge.  Claims II through IV have also been withdrawn by Plaintiff.

federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n. 9 (1999). To state a viable § 1983 claim, a plaintiff must establish:  (1) that the alleged wrongful conduct was committed by a person acting under color of state law, and (2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc).

It is also well established that each of the individuals named as Defendants must be shown to have had personal involvement in the alleged misconduct in order for them to be held liable under § 1983.  *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior.").  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id*.

With respect to the "color of state law" requirement, there is no real dispute by the Defendants that Logue and DiVecchio were state actors insofar as their conduct in ending Adams's employment is concerned.  On the other hand, there is a dispute as to whether Agresti can properly be considered a state actor for purposes of this lawsuit. For reasons which are discussed in more detail below, we find that Agresti cannot be considered a state actor and, moreover, there is insufficient evidence to support an inference of personal involvement on his part relative to Adams's termination. Therefore, §1983 liability cannot be established on the part of Agresti based on this record.

With respect to the second requirement – i.e., establishing a violation of a federally secured right or privilege, Adams contends that he was terminated from his position as First Assistant Public Defender in retaliation for exercising his right under the First Amendment to refrain from supporting the DiVecchio campaign by monetary contributions or otherwise.  Specifically, he claims that he was performing his job well and was discharged without cause so that DiVecchio and Logue could provide a patronage position to Pitonyak, who had supported the DiVecchio campaign.

In *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265 (3d Cir. 2007), the Third Circuit Court of Appeals held that the First Amendment protects politically neutral or apolitical government employees from political patronage discrimination.  490 F.3d at 276.  The court also set forth the following three-part test for establishing such a claim. First, to make out a prima facie case, the plaintiff must show that:  (1) he/she was employed at a public agency in a position that does not require political affiliation (*i.e.*, a non-policymaking position), (2) he/she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision.  490 F.3d at 271 (*citing Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997)).  Once the plaintiff makes this demonstration, the defendant employer may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity."  *Id*. (citations omitted).  In deciding whether the plaintiff has established a *prima facie* case at the summary judgment stage, we must draw all reasonable factual inferences in the plaintiff's favor.  *Id*. at 272.

Here, the Defendants have challenged Adams' proof relative to all three prongs of his *prima facie* case.  First, Defendants dispute that the position of First Assistant Public Defender is a non-policymaking position.  While denying that Adams's political affiliation was an actual motivating factor in his firing, the Defendants nevertheless argue that this type of consideration would have been perfectly appropriate because, in their view, the position of First Assistant Public Defender is a policymaking job.

Second, the Defendants contend that Adams has failed to demonstrate that he maintained any kind of "political affiliation" that would qualify as protected activity under the First Amendment.  Although Defendants acknowledge that the First Amendment protects the rights of citizens to be politically "unaffiliated," they claim that Adams was neither politically unaffiliated nor politically inactive inasmuch as he, like DiVecchio, has been a lifelong member of the Democratic Party, he has been involved in political campaigns in the past, and he actually contributed support to DiVecchio's campaign.

Third, Defendants contend that Adams has failed to show that the named Defendants had knowledge of his political "non-affiliation" and/or that such "non-affiliation" was a substantial or motivating factor in his discharge.

For purposes of the pending motion only, I will assume (without deciding) that Adams has produced sufficient evidence to at least create a jury question relative to the first two prongs of his *prima facie* case – that he held a non-policymaking job and that he engaged in activity (or nonactivity) relative to the DiVecchio campaign that would be protected by the First Amendment.[3]  Ultimately, I need not decide these issues because

---

[3]We note that the First Amendment's protection extends beyond traditional party affiliation, since even employees with the same political affiliation as the decision-maker may be entitled to First

I conclude that the record in this case cannot support a finding as to the third prong of Adams' *prima facie* case.

I therefore segue directly to that *prima facie* element, which requires Adams to show that his constitutionally protected conduct was a "substantial or motivating factor" in his termination.  *Galli,* 490 F.3d at 275; *Stephens*, 122 F.3d at 176.  Implicitly, this prong requires that the plaintiff produce sufficient evidence to show the defendants' awareness of the plaintiff's protected political activity or non-activity, "which requires proof of both knowledge and causation."  *Galli,* 490 F.3d at 275 (*quoting Goodman v. Pennsylvania Turnpike Com'n*, 293 F.3d 655,664 (3d Cir. 2002)).  Because personal involvement in the alleged wrongdoing must be established with respect to each individual Defendant, *Rode v. Dellarciprete,* 845 F.2d at 1207, we consider the evidence of record as it bears, respectively, on Agresti, DiVecchio, and Logue.  *See Heath v. Pennsylvania Turnpike Comm'n*, No. 1:10-cv-0494, 2011 WL 1520022 at *5-6 (M.D. Pa. April 20, 2011) (in employment case based on alleged political discrimination, court would examine the role of each defendant in the adverse employment decision to assess whether knowledge and acquiescence of political discrimination could be found).

### a)  Defendant Agresti

On the heels of DiVecchio's success in the November 2005 general election came his request that Agresti assist in heading up a transition team for the purpose of

---

Amendment protection.  *See Curinga v. City of Clairton*, 357 F.3d 305, 311 (3d Cir. 2004) (citations omitted); *Borough of Catawissa*, 749 F. Supp. 2d 244, 254 (M.D. Pa. 2010).  As our circuit court of appeals has noted, other federal courts "have broadened the definition of 'political affiliation' to include commonality of political purpose, partisan activity, and political support."  *Curinga*, 357 F.3d at 311 (citations omitted).  Our court of appeals has also given this concept broad construction, finding that the First Amendment protects "political unaffiliation or 'failure to support' the official or party in power."  *Galli*, 490 F.3d at 265.

recommending candidates for certain positions within the Erie County government. Accordingly, in the latter part of 2005, Agresti and then-District Attorney Foulk assembled a team which included a number of other individuals from the local community, including Attorney Wally Knox.

Apart from his involvement in the transition team, Agresti had also served during the general election as DiVecchio's legal counsel in election and recount matters. In addition, he drafted the letters of termination that were signed by Logue and DiVecchio on December 30, 2005 and sent out to Adams, Weinraub, and Clelland.

However, during the time frame following DiVecchio's election and culminating in Adams's notice of termination on or about December 30, 2005, Agresti was not a public official but was engaged in private practice at his family's law firm. His work for DiVecchio relative to election and recount matters was performed in his capacity as a private attorney, as was his post-election work on the DiVecchio transition team. Accordingly, Defendants contend that Agresti was not a person acting "under color of state law" for purposes of §1983.

Under §1983, a private individual can be held liable for the violation of the plaintiff's federal rights if the violation occurs as the result of an official act in which the private individual was complicit with a state actor. *See, e.g., Dennis v. Sparks*, 449 U.S. 24, 29 (1980) (private parties who corruptly conspire with a judge in connection with an official judicial act would be acting under color of state law within the meaning of §1983); *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 941 (1982) (a private party's joint participation with state officials in the seizure of disputed property would suffice to establish state action); *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615

15

F.3d 159, 176 (3d Cir. 2010) (§ 1983 claim could be stated against private defendants if the plaintiff adequately pled the existence of a conspiracy between the private actors and judges of the Pennsylvania court system).

In this case, however, the evidence fails to support a reasonable inference that Agresti conspired with Logue or DiVecchio so as to effectuate Adams's termination.  For that matter, there is insufficient evidence from which a jury could infer that Agresti was involved in any of the hiring or firing decisions within the public defender's office.

First, there is no evidence to suggest that Agresti had influence as a member of the transition team over DiVecchio's decision to appoint Logue as Chief Public Defender or Pitonyak as First Assistant.  Of immediate concern to the transition team was helping DiVecchio find candidates to fill certain key positions within the Administration – especially Finance Director, Personnel Director, and County Solicitor.  (Foulk Depo. [57-11] at pp. 34-35, 69; Agresti Depo. [57-8] at 32.)

With regards to DiVecchio's selection of Logue as Chief Public Defender, there is some conflicting evidence as to whether DiVecchio made this decision completely on his own or whether he relied on advice from Foulk.  DiVecchio maintains that he independently chose Logue for that position at the time of the Democratic primary or perhaps even earlier (DiVecchio Depo. [66-1] at pp. 40, 47-48, 102), which would have been long before Agresti became involved in his campaign or was asked to form a transition team.  Agresti has testified, however, that DiVecchio solicited the advice of Foulk in selecting Logue for the Chief Public Defender position.  (Agresti Depo. [57-8] at 31-35.)

16

Regardless, however, there is no evidence to suggest that anyone on the transition team other than perhaps Foulk had input regarding DiVecchio's selection of Logue as Chief Public Defender.  (Foulk Depo. [57-11] at p. 57; *see also id*. at pp. 36-44, 57, 80; DiVecchio Depo [66-2] at 78; Knox Depo. [57-10] at 60-65.)

Nor is there evidence to suggest that the team ever discussed any of the positions to be vacated or filled within that office below the position of Chief Public Defender.  (Foulk Depo. at pp. 36-44, 57, 80; DiVecchio Depo [66-2] at 78; Knox Depo. [57-10] at 60-63, 64-67, 69; Agresti Depo. [57-8] at 58-59.)[4]  Rather, the record here is consistent in showing that the selection of Pitonyak as First Assistant Public Defender was made by Logue and approved by DiVecchio.  Other staffing decisions within that office were similarly made by Logue, with the ultimate approval of DiVecchio. (DiVecchio Depo. [66-2] at 58-79; Knox Depo. [57-10] at 64-67, 70; Agresti Depo. at 58-59.)  In fact, Adams has admitted that he never approached Agresti concerning employment decisions within the public defender's office and did not believe that Agresti had any authority as a member of the transition team to make those types of decisions. (Adams Depo. [63-2] at p. 341.)

The record also fails to support a reasonable inference that Agresti was influential in Adams's firing in his capacity as DiVecchio's private legal counsel.  It is not disputed that Agresti drafted the termination letters which were distributed to Adams, Weinraub and Clelland, and while there is conflicting evidence as to whether Agresti himself chose the language to be used in the letters, there is no evidence to suggest

---

[4] It does appear, however, that Foulk provided a personal recommendation in favor of Ian Murray when Murray applied for employment in the public defender's office.  (See Foulk Depo. [57-11] at 79.)

that Agresti was involved in the actual decision-making process relative to these job terminations.

Rather, the unrebutted evidence establishes that Agresti did not have conversations with DiVecchio about any of the attorneys who would be let go from the public defender's office.  Although Agresti admits to being approached by Logue concerning certain staffing issues within that office, he states that he simply advised Logue to take those issues to DiVecchio, since DiVecchio was the ultimate decision-maker.  Agresti did not know what criteria Logue and DiVecchio used to determine staffing positions within the public defender's office, and he did not render a legal opinion to the DiVecchio transition team regarding any personnel matters.  He learned of Pitonyak's appointment as First Assistant only after Pitonyak was already hired. (Agresti Depo. at 60.)

In sum then, the only reasonable inference in light of this record is that Agresti was not a public agent at the time of Adams's firing and had no personal involvement in the employment decisions concerning that office.[5]  Because Agresti cannot be considered a "state actor" and/or because he lacked any personal involvement in the alleged violation of Adams's First Amendment rights, he is entitled to summary judgment on Adams' § 1983 claim.

### b)  Defendant DiVecchio

Unlike Agresti, DiVecchio -- as County Executive and one of the two persons who signed Adams's termination notice -- was clearly a decision-maker.  Nevertheless,

---

[5] Although Adams makes much of Agresti's alleged statement to Trooper Brown, for the reasons discussed at more length in Part III (b)(vii), we find this statement to be a stray remark by a non-decisionmaker which carries no probative value relative to the ultimate issue of political discrimination.

it is still incumbent upon Adams to produce evidence from which a jury could reasonably infer either:  (a) that DiVecchio had knowledge of Adams's protected political status and was personally motivated by that protected status in approving Adams's termination or (b) that DiVecchio knew Logue was acting on the basis of a politically discriminatory motive in seeking Adams's termination and acquiesced in that discrimination.

Here, the evidence uniformly shows that DiVecchio played a passive role with respect to employment decisions in the public defender's office.  Essentially, DiVecchio allowed Logue to make the staffing decisions within the office and did not offer any input into Logue's recommendation.  (Logue Depo. [57-9] at 113.)  Rather than offer specific directions on what personnel decisions to make in the office, DiVecchio simply told Logue "to put a team together that he thought would accomplish the goals that he had for the office."  (DiVecchio Depo. [66-2] at 59.)  As DiVecchio stated, "Once I turned it over to Tony, ... I never had anything really to do with the office."  (DiVecchio Depo. at 63.)  He relied on Logue's recommendations because, has he put it, "I'm a firm believer in expert advice... and I didn't want to say that I wanted this person hired, this person hired, because I don't know any lawyers quite that well."  (DiVecchio Depo. at 59.)  Logue therefore did not seek DiVecchio's advice on whether or not he should remove anyone in particular from the office.  (DiVecchioDepo. at 64.)  Most relevantly, Logue and DiVecchio did not have any discussions about Adams, Weinraub, or Clelland. (DiVecchio Depo. at 65.)   Insofar as the First Assistant position is concerned, DiVecchio was aware that Logue was going to put Pitonyak in the First Assistant position but, he claims, he did not even know that Adams held that job.  (DiVecchio Depo. at 64.)

Adams nevertheless maintains that his discharge was the result of a broad-based scheme on the part of DiVecchio and Logue to remove non-union, non-policymaking county employees from their jobs so that those positions could be made available to other individuals who had supported DiVecchio in the 2005 election.  The difference between himself and these other individuals, Adams claims, is that those who found employment within the county government under DiVecchio's Administration generally contributed $500 or more to DiVecchio's campaign or were otherwise more politically active in support of DiVecchio than Adams was.

Defendants' rejoinder to this argument has at least two components.  For one, they have argued that there is no factual support in the record to establish that various employment decisions relied upon by Adams were preceded by a monetary contribution of $500 or more.  (See Defs.' Reply to Pl.'s Concise Statement of Material Facts [77] at ¶¶ 61-63.)  Secondly, Defendants dispute the relevance of any employment decision other than the Defendants' decision to hire Pitonyak in the job formerly held by Adams.

Out of an abundance of caution, this Court will examine each element of Adams's proof as it relates to his "pay-to-play" theory.  Having carefully reviewed the record in depth, we find that it cannot support a viable First Amendment claim based on alleged political discrimination.

(i)    Pitonyak's Hiring and Adams's Firing

With respect to his own termination – which is ultimately the only employment-related decision of consequence in this case, Adams's theory is demonstrably problematic.  Adams has shown that he contributed only $150 dollars towards DiVecchio's campaign, whereas Pitonyak is said to have contributed approximately

20

$1,000.  However, if financial support for DiVecchio's campaign is the primary

employment-related criterion as Adams contends, then the only contributions relevant to

our analysis are those which Pitonyak made prior to (or perhaps very soon after) being

awarded the job as First Assistant Public Defender.  Any amounts that were contributed

substantially later -- after the relevant employment decision had already been made --

are of no moment from an evidentiary standpoint because they cannot support a

reasonable inference that the payment served as a quid-pro-quo for employment.

Here, uncontradicted evidence shows that Pitonyak gave $100 to DiVecchio's

fundraising committee on September 30, 2005 and $250 on December 23, 2005, the

latter representing a payment for tickets to DiVecchio's inaugural ball.  (Pitonyak Depo.

[57-6] at pp. 40-41.)  Although Pitonyak made additional contributions to DiVecchio in

amounts ranging from $250 to $500 for each of the calendar years 2006-2009 (*see*

Pitonyak Depo. [57-6] at 41 and DiVecchio Depo at pp. 107-08, 120), these

contributions occurred well after Pitonyak had already been selected as the First

Assistant Public Defender and, therefore, it cannot reasonably be assumed that they

were a motivating factor in his appointment to that position.[6]  Thus, at most, Adams can

show he gave $150 in political contributions prior to receiving his termination letter,

while Pitonyak gave $350.  Since Pitonyak's contribution was below the $500 amount

that Adams contends was a quid-pro-quo for employment, this evidence contradicts

Adams's theory.

---

[6]We note, for example, DiVecchio's testimony that Pitonyak paid $500 to DiVecchio's post-election
fundraising committee sometime during the period May 10, 2006 to December 31, 2006.  (See
DiVecchioDepo. [66-3] at pp. 107-08,120.)  It is not clear from the record the exact date on which the
contribution was made but, at the very least, the payment could not have occurred before May 10, 2006 –
some five months after Pitonyak was chosen to be the First Assistant Public Defender.

Nor does the evidence fairly suggest that Pitonyak was significantly more active than Adams with respect to the DiVecchio campaign. Pitonyak had never made a contribution to the DiVecchio campaign prior to the 2005 primary election.  Insofar as support of DiVecchio is concerned, the only real difference between Adams and Pitonyak as of December 30, 2005 is that Pitonyak had contributed $350 to DiVecchio's fundraising efforts, while Adams had contributed only $150.  Under the totality of circumstances, I find this difference too *de minimus* to allow an inference that Pitonyak's replacement of Adams as First Assistant Public Defender was politically motivated.

The evidence is even more problematic for Adams if we consider Pitonyak's testimony that Logue offered to make him First Assistant Public Defender sometime in mid-to-late November of 2005, after Logue had been chosen as Chief Public Defender. (Pitonyak Depo. at 48, 52.)  (This consideration is particularly relevant in light of other uncontradicted evidence which suggests that DiVecchio was not personally involved in the selection of Pitonyak as First Assistant Public Defender but merely deferred to Logue's recommendation in that regard.)  Under that scenario, only the $100 which Pitonyak contributed to the DiVecchio campaign on September 30, 2005 could be relevant to the employment decision that ultimately resulted in Adams' termination.  In other words, Adams's argument would have to be that Pitonyak was chosen as his replacement in or around late November of 2005 because of the fact that Adams, as of that date, had only contributed $50 towards DiVecchio's campaign, whereas Pitonyak had contributed $100.  Under this scenario, the distinction between Adams's contribution on one hand and Pitonyak's on the other is even more *de minimus* and

22

incapable of supporting a reasonable inference of political discrimination on the part of DiVecchio.

(ii)    Logue's Appoinment as Chief Public Defender

To a large extent, Adams has sought to buttress his own personal claims of political discrimination by relying on evidence concerning other county employees.  In so doing, he claims to have uncovered a general pattern on the part of DiVecchio of rewarding people who supported his candidacy.  Implicitly, he seems to be arguing that we should infer a similar, politically-motivated animus as the reason for his own firing. While Adams has proffered numerous pieces of evidence which supposedly reveal a broad-based "pay-to-play" scheme on the part of DiVecchio, the record as a whole does not support the suggested inference of political discrimination.

Adams posits, for example, that Logue was awarded the position of Chief Public Defender based on a deal which DiVecchio struck with District Justice DiPaolo and County Councilman Leone, both longtime Democratic officials serving Erie's Sixth Ward.  Both Leone and DiPaolo, it is claimed, were supporters of Logue.  Citing DiVecchio's deposition transcript, Adams contends that:

> [i]n return for the promises of political support in the 2005 campaign by County Councilman Fiore Leone and Magisterial District Judge Dominick Di[P]aolo[,] Mr. DiVecchio agreed that he would appoint Anthony Logue as the First Assistant Public Defender of Erie County.  County Councilman Fiore Leone and Magistrate Judge Dominick DiPaolo provided that support and when elected Mr. DiVecchio appointed Mr. Logue as the [F]irst Assistant Public Defender of Erie County.

(Pl.'s Statement of Material Facts [61] at ¶ 64, p. 12.)  Adams suggests that this deal was struck during a lunch meeting held at the Oakwood Café, at the conclusion of

which, it is alleged, "Divecchio had pledged to others that if elected he would appoint Mr. Logue as Public Defender."  (*Id.* at ¶ 38, p. 7.)

Upon review of the cited transcript, however, it is clear that there was never any bargain made whereby political support from the Sixth Ward in the general election would be a quid-pro-quo for Logue's appointment.  Rather, DiVecchio's deposition testimony is clear that the referenced lunch meeting occurred only *after* DiVecchio had already won the general election (despite a poor performance in the Sixth Ward, not because of a good performance there) and only *after* DiVecchio had already privately decided to appoint Logue as Chief Public Defender.  The transcript establishes that DiVecchio had known Logue by virtue of their prior interactions when DiVecchio was serving on County Council and Logue was serving as the Council's solicitor.  According to DiVecchio's testimony, his decision to appoint Logue was based on the fact that he liked Logue's compassionate style, his sense of fairness, and his respectful manner. (DiVecchio Depo. at pp. 48, 59.)

Regarding the Oakwood Café lunch meeting, DiVecchio testified that, after DiPaolo had bad-mouthed him and allegedly caused his poor performance in the Sixth Ward in the general election, DiPaolo nevertheless asked, as a "favor," that Logue be considered for the Public Defender position.  (DiVecchio Depo. at p. 101.)  In order to "get one over" on DiPaolo and "make him squirm" and to give the appearance that he was granting DiPaolo a political favor, DiVecchio acted as though he had not yet made up his mind about Logue's appointment.  (DiVecchio Depo. at p. 102.)  At the conclusion of the lunch meeting, which Adams implicitly agrees would have to have

occurred in November of 2005 (*see* Pl.'s Statement of Material Fact [61] at ¶ 40, p. 7), DiVecchio publically agreed to appoint Logue as Chief Public Defender.

Taken as a whole, this evidence regarding the Oakwood Café luncheon establishes only that DiVecchio created the illusion of granting a gratuitous political favor to DiPaolo, whom DiVecchio claims had undermined him in the 2005 general election. The evidence does not support an inference that DiPaolo actually provided any meaningful political support to DiVecchio (quite the opposite), much less does it support an inference that Logue was given his job as a result of political support from DiPaolo or other members of the Sixth Ward. DiVecchio's uncontroverted testimony is that he had privately selected Logue for the job of Chief Public Defender long before the general election or the Oakwood Café meeting on the basis of his own personal dealings with Logue while the two of them were involved with County Council.[7]

(iii)   <u>Employment Decisions Within the Public Defender's Office at Large</u>

Adams also relies on employment decisions affecting the public defender's office at large as evidence of political discrimination. He claims that the four attorneys fired from the public defender's office – himself, Konzel, Weinraub, and Clelland – happened to be the highest paid attorneys. In addition, Adams claims, he, Konzel, Weinraub and Clelland were neither politically active nor supportive of DiVecchio. Adams asserts that, once he and the others were fired from their full-time positions, those jobs were summarily filled by DiVecchio supporters, rather than being subjected to the usual

---

[7]It should also be noted that, although Logue supported DiVecchio in the general election, Logue was not involved in DiVecchio's primary campaign, nor had Logue worked on any of DiVecchio's prior campaigns when DiVecchio was running for a seat on county council. Thus, Logue apparently had no history of supporting DiVecchio's political career prior to the time that DiVecchio claims he selected Logue as his future Chief Public Defender (i.e. no later than the 2005 primary).

advertising process.  The only permissible inference, he insists, is that the terminations and hirings were politically motivated such that the highest paying jobs in the public defender's office could be awarded to persons loyal to DiVecchio.

Again, however, the proposed inference is not supported by an examination of the actual summary judgment record.  Specifically, the record does not support Adams's claim that the attorneys hired into the open spots at the public defenders' office were necessarily DiVecchio supporters.  In fact, it is not even clear from the record which attorneys filled the spots left open by Clelland and Weinraub.

Adams contends that one of the replacements was Ian Murray, a one-time chair of the local Democratic party and delegate to the National Democratic Convention. Notably, though, there is nothing in the record to suggest that Murray was politically active on behalf of the DiVecchio campaign or that Murray made any monetary contribution to it.  Moreover, the record shows that Murray did not take either of the full-time trial division jobs vacated by Weinraub or Clelland; instead, he was hired on a full-time basis to handle juvenile matters – a vacancy which had been created when the previous assistant public defender handling those cases, Ines Massella, transferred over to the Office of Children and Youth.  Nor is there any evidence before us to suggest that Murray was paid at a higher salary than other assistant public defenders.

Adams maintains that another DiVecchio appointee who took one of the full-time trial division spots was John Moore, whom Adams characterizes as Agresti's law partner.  In actuality, Agresti testified that Moore merely rented office space from his family's law firm.  (Agresti Depo. [57-8] at 80.)  Presumably, Moore's connection to Agresti is meant to support the inference that favoritism was given to Moore on the

basis of political considerations.  However, Agresti testified that Clelland also had rented

office space at the Agresti firm during his tenure as a part-time assistant public defender

(see Agresti Depo. at 12) and, in that respect, Moore had no greater connection to

Agresti than Clelland had.  Putting that fact aside, however, there is no evidence in the

record to suggest that Agresti was influential in getting Moore hired in that office, much

less is there evidence to suggest that Moore was hired on the basis of some political

favor to Agresti.  There is also no evidence of record, as far as we are aware, to

suggest that Moore was helpful to DiVecchio or supported him in any way in the 2005

election.  Nor is there anything in the record indicating that Moore received a higher

salary than his fellow assistant public defenders.

Three other assistant public defenders who did not lose their jobs following

Logue's appointment – Tina Fryling, Deanna Heasley, and Allison Scarpitti – appear to

have made contributions towards DiVecchio's campaign, as is illustrated by the fact that

their names appear alongside Adams's on a campaign flier which lists them all as

sponsors of a 27-inch television and DVD raffle.  (See Adams Depo. Ex. D-16 [62-5].)

While Adams alleges that Scarpitti and/or her father contributed approximately $1,000

toward DiVecchio's election, there is nothing in the record to actually document (a) that

such an amount was paid and (b) that the alleged payment had any temporal relevance

to the employment decision.[8]  With respect to Fryling and Heasley, there does not

---

[8] The transcript of DiVecchio's deposition suggests only that Scarpitti's name appears on a campaign finance disclosure form covering the period May 10 – December 31, 2006.  Thus, we may infer that a contribution was made by Scarpitti during this general timeframe, but no indication is given in DiVecchio's deposition as to the amount of the contribution or the precise date on which it was made. (See DiVecchio Depo. at p. 111, 107.)  In any event, however, we may assume that this contribution did not occur any earlier than May 10, 2006, which is well after the date on which Adams, Weinraub and Clelland received their termination letters.  (continued …)

appear to be any information in the record indicating what amounts they gave toward the raffle.  Thus, there is no basis from which we can infer that these attorneys, who were retained under Logue, gave anything more than Adams gave as of the date that Adams, Weinraub, and Clelland were fired.

Adams's theory is further muddled by the absence of any evidence suggesting that numerous other attorneys hired or retained by the new administration were supportive of DiVecchio's campaign.  For example, attorneys Steven Lagner and Joseph Burt maintained full-time employment with the public defender's office after Logue became Chief Public Defender (*see* Larry Meredith Depo. ([69-4] and [69-5] at pp. 99-103; Logue Depo. at 17-18, 31, 39, 49; Pitonyak Depo. at p 95), but Adams does not contend that these individuals were politically supportive of DiVecchio during the 2005 election and no evidence exists in this record to suggest that they were.  Among the new attorneys who were hired into the office on a full-time basis at or around the time that Logue took over as Chief Public Defender were Bernie Hessley, Dave Ungerman, and Michael DeJohn.  (See Meredith Depo. at pp. 99-100; Pitonyak Depo. at pp. 74-75; Logue Depo. at pp. 66-67, 69-70.)  Again, however, Adams does not contend that these individuals were politically supportive of DiVecchio, and there is no evidence before us to suggest that they were.

---

Adams has also asserted that Ken Bicker and Kenneth Porsch, two associates of the law firm Vendetti & Vendetti, were allowed to keep their positions as part-time assistant public defenders under Logue due to the fact that their law firm had contributed $700 to DiVecchio's campaign.  However, as the Defendants assert in their response to Plaintiff's Concise Statement of Material Facts [77], the evidence of record does not establish that a contribution in this amount was made. (See id. at p. 9, ¶ 62.)  Although we can infer from DiVecchio's deposition that some contribution was made by the firm during the 2005 campaign, no amount is provided in the transcript.  (See DiVecchio Depo. at 139, 203-04.)

Taken as a whole then, the evidence of employment-related decisions within the public defender's office does not reasonably support an inference that those jobs were awarded on the basis of political support for the DiVecchio campaign.

(iv)    Employment Decisions Regarding Other Attorney Positions

Adams also asks the Court to consider employment-related decisions relative to the Office of Children and Youth (OCY) as further evidence that his own termination was "part of a mass termination of nonunion attorney employees of the County of Erie for the purpose of opening positions which were in the control of the executive so his supporters could be placed in these positions[.]"  (Pl.'s Statement of Material Facts [61] at ¶ 55, p. 9.)  Specifically, Adams contends that three attorneys for OCY who allegedly did not support DiVecchio in his 2005 campaign – chief solicitor Michael Cauley, and assistant solicitors Cathy Allgeier and Ken Zak – lost their jobs after DiVecchio assumed office.  In his deposition, DiVecchio testified that one of his top priorities upon assuming office was to fire the legal staff at OCY because he had formed the impression that the OCY attorneys were overriding the caseworkers, assuming control of the office, and shaping -- rather than implementing -- county policy.  (DiVecchio Depo. [66-1] at p. 33.)

Adams asks us to infer that the firings were politically motived based on the fact that Ines Massella was appointed by DiVecchio to become the new chief solicitor for OCY and Agresti was appointed as an assistant solicitor in that office, and both Massella and Agresti were supportive of DiVecchio in his campaign to become county executive.  Assuming, without deciding, that these employment decisions have some relevance with respect to Plaintiff's own employment discrimination claim, we note that the record also reflects DiVecchio's hiring of a third attorney as assistant solicitor for

29

OCY by the name of Eric Hackwelder.  (See DiVecchio Depo. at p. 39.)   There is no

contention by Adams, nor any evidence to suggest, that Hackwelder was politically

active or supportive of DiVecchio's campaign.

(v)     Employment Decisions Regarding Certain Other Non-Union County Positions

To further buttress his theory of mass political discrimination within the DiVecchio

Administration, Adams asks us to consider certain other nonunion (and mostly non-

attorney) employees who allegedly supported DiVecchio in his 2005 campaign and also

obtained county jobs.  Adams's theory, to reiterate, is that "[g]enerally nonunion

employees who paid more than $500.00 to the campaign kept their positions and those

who did not pay that much lost them.  Persons who were seeking nonunion positions

and paid $500 or more dollars got them."  (Pl.'s Statement of Material Facts [61] at ¶ 61,

p. 10.)  To illustrate his point, Adams names the following individuals as "pay-to-play"

beneficiaries:  Wally Knox (who became the Solicitor of Erie County under DiVecchio's

Administration); Sean Wiley (who became the Director of Administration); Larry

Meredith (who became the Director of Personnel); Robert Spaulding (who became the

Economic Development Director); Luigi and Sue Ellen Pascal (who retained their

respective jobs as Purchasing Manager and Director of General Accounting); Joseph

Weindorf (who remained Public Safety Director); Rick Seus (who remained Director of

Drug and Alcohol Programs); and Gary Lucht (who stayed on as Director of OCY).

Adams seeks to contrast these individuals with the seven attorneys from the

public defender's office and OCY (including himself) whom, he claims, did not contribute

$500.00 or more to DiVecchio's campaign.  In this same category of apolitical,

terminated employees, Adams includes Ed Vereb, the former Director of Maintenance

under the Schenker Administration, who was discharged by DiVecchio and replaced with an individual by the name of Michael Kraus.

Assuming once again, without deciding, that these employment decision bear some relevance to Adams's own personal claim of political discrimination, we perceive several problems with this particular evidentiary proffer, one of which is Adams's reliance on seemingly inappropriate comparators.  As we have discussed, Adams must show as part of his prima facie case that he was terminated from a non-policy-making job and that a substantial or motivating factor in the termination was the Defendants' inappropriate consideration of Adams's political affiliation or political status, see *Galli*, 490 F.3d at 271; yet some of Adams's named comparators held administrative positions that would likely involve policy-making responsibilities.

For example, Adams points to DiVecchio's decision to appoint Knox as County Solicitor and implies that Knox was hired because of a $750.00 contribution he had made to DiVecchio's campaign.  Even if the circumstantial evidence supported the inference that Knox's appointment was politically driven (and for reasons we will discuss below, it does not), it would not necessarily be appropriate to consider Knox as a comparator to Adams because political affiliation is likely an appropriate consideration with respect to the job of county solicitor.  *See Ness v. Marshall*, 660 F.2d 517, 522 (3d Cir. 1981) (holding that city solicitor's duties of rendering legal opinions, drafting ordinances, and negotiating contracts made his position intimately related to city policy). Adams's reliance on employment decisions relative to other key administrative positions – e.g. Director of Administration, Director of Personnel, Director of Economic Development, Director of Public Safety, and Director of OCY – seems similarly

misplaced.  (See Defs.' Ex. N [57-15] County Administrative Code).  At the very least, we have serious questions concerning whether these are relevant comparator jobs as to which consideration of political affiliation would be inappropriate.

Moreover, as to some of Adams's comparators, there is unrebutted evidence which precludes any reasonable inference that the individual in question was in fact hired on the basis of political considerations.  With respect (again) to Knox's appointment, the evidence shows that Knox had never made a campaign contribution to DiVecchio prior to becoming County Solicitor and, in fact, had contributed to and supported DiVecchio's opponent in the general election, Dale McBrier.  The evidence further establishes that Knox fully disclosed this information to DiVecchio at the time his job offer was discussed, but DiVecchio offered Knox the solicitorship anyway.  (Knox Depo. [57-10] at 25-27, 52; DiVecchio Depo. at 82.)   Under these circumstances, no reasonable factfinder could conclude that Knox was hired on the basis of a political contribution.

Gary Lucht, the Director of OCY, is also among the individuals whom Adams claims was able to keep his job because of a $500 contribution.  Lucht, however, had been appointed Director of OCY by the Schenker Administration following the death of Brittany Legler[9] and, according to DiVecchio, both he and McBrier, while campaigning for the general election, had agreed to allow Lucht to keep his job so that he could have a year to "straighten things out" in that office.  (DiVecchio Depo. at 32; Foulk Depo. at 35-36.)  Adams has not offered any evidence to rebut DiVecchio's uncontroverted

---

[9] This tragic case spawned a separate federal civil rights action, which was the subject of this Court's ruling in *Hayes v. Erie County Office of Children and Youth*, --- F. Supp. 2d ---, 2011 WL 1201194 (W.D. Pa. Mar. 29, 2011).

testimony – just his claim, unsubstantiated on this record, that Lucht paid $500 to DiVecchio's campaign.  Thus, the evidence before us does not support an inference that Lucht's retention was motivated by political fealty to DiVecchio.

Adams also points to Larry Meredith, DiVecchio's Director of Personnel, as someone who allegedly obtained employment only after contributing $890.00 to DiVecchio's campaign.  However, there is uncontradicted testimony of record establishing that DiVecchio's original choice for Personnel Director was Carol Habas.  Habas had been identified as a possible candidate by a professional acquaintance of Foulk's during the time that Foulk was serving on DiVecchio's transition team.  Habas initially accepted the position but then left the job within days thereafter, leaving that key position open.  (Meredith Depo. at 15-18, 112, 151; Foulk Depo. at 59-61; Knox Depo. at 104-06.)  There is no evidence of record to suggest that Habas was a supporter of DiVecchio or that her offer of employment with the County was politically motivated in any way.  After Habas quit the position, Meredith applied for and was offered the job.  Thus, the circumstances under which Meredith came to be Personnel Director belie the suggestion that DiVecchio deliberately opened this position for the benefit of rewarding a political supporter.

Adams's evidentiary proffer suffers from other problems as well.  Although each of the named comparators is alleged to have contributed $500 or more to the DiVecchio campaign, the record that we have been presented with here fails, in many cases, to document the political contributions that Adams claims were made.[10]  To the extent that

---

[10]In support of his "pay-to-play" theory, Adams relies on information reportedly gleaned from the financial disclosure forms of DiVecchio's two fundraising committees, "Friends of DiVecchio" and the "Committee to Elect DiVecchio."  Despite the fact that Adams's theory of a wide-spread "pay-to-play" scheme is based

information can be derived from other portions of the record – principally, DiVecchio's

deposition transcript, we credit that evidence and construe it in Adams's favor.

However, there are numerous factual assertions in Adams's Statement of Material Fact

(*see id*. [61] at ¶¶ 61-63) which lack any evidentiary support in the actual summary

judgment record.  By way of example, no evidence has been presented to support

Adams's allegations concerning the financial contributions made by or on behalf of Gary

Lucht, Robert Spaulding, or Luigi and Sue Ellen Pascal.  Although these individuals are

discussed in DiVecchio's deposition and the record suggests that they contributed

something to DiVecchio's fundraising committees, the amounts of the contributions are

not discussed, making it impossible for this Court to evaluate Adams's claim that

payments of $500 or more were made by these individuals.

Equally problematic from an evidentiary standpoint is the fact that that Adams

fails to consider when in relation to the relevant employment decision these payments

occurred.  For example, with respect to Adams's assertions about Sean Wiley, Rick

Seus, Robert Spaulding, and Joseph Weindorf, the record as it stands contains no

evidence to suggest that any of these individuals made contributions to the DiVecchio

campaign during 2005.  At most, the record suggests that these individuals made

contributions sometime between May 10 and December 31, 2006, or at some point in

---

upon information taken from DiVecchio's campaign fundraising disclosure forms, those forms have not been made part of the summary judgment record.  Although the forms were designated as exhibits to the depositions of DiVecchio and Agresti, and although they are generically cited as supportive of numerous assertions set forth in Adams's Statement of Material Facts (see id. [61] at ¶¶ 61-63), the records have not been submitted in conjunction with the pending motion.  We note that the contents of the records are discussed in some detail in DiVecchio's deposition which, along with the rest of the summary judgment record, this Court has reviewed in depth.  Accordingly, insofar as campaign contributions and the related hiring decisions are concerned, this Court has gleaned what it can from the evidence that is available and considered it in the light most favorable to Adams – but also in the context of the undisputed record as a whole.

2007.  (See discussion of DiVecchio Depo. Ex. 3 and 4, discussed in DiVecchio Depo. [66-3] at pp. 107-34.)

No proffer has been made by Adams as to when Wiley, Seus, Spaulding, or Weindorf came under consideration for their respective jobs.  With respect to Wiley, though, the record suggests that he assumed the position of Director of Administration approximately six months after DiVecchio took office (i.e, around mid-2006), following his predecessor's transfer to a different job.  (See Knox Depo. at 62, 66.)  Adams claims that Wiley became Director of Administration only after contributing $2,750.00 to DiVecchio; however, the only contribution which this Court can document is a $2,500 contribution made in September of 2007, well after Wiley had already obtained his job. (See DiVecchio Depo. [66-3] at 133.)

With respect to Lucht's unspecified contribution, we can infer only that he gave some amount of financial support to the Friends of Mark DiVecchio during the time period May 10, 2006 to December 31, 2006.  (DiVecchio Depo. [66-3] at 110.) Significantly, though, Lucht was a carry-over from the Schenker Administration and, thus, the time frame of his contribution post-dates both the 2005 election and the date on which he began work under the DiVecchio's Administration.

Similarly, with respect to Seus and Weindorf, the record shows only that they made contributions to DiVecchio's fundraising committees in some unspecified amount sometime between May 10, 2006 and December 31, 2006 and that they made further contributions at some point during calendar year 2007 in the respective amounts of $250 and $400.  (DiVecchio Depo. at 111-12, 132-33.)  However, since Seus and Weindorf were also kept on from the Schenker Administration, their respective

contributions substantially post-date the commencement of their employment under the DiVecchio Administration.

From an evidentiary standpoint, these details matter.  If Adams is suggesting that a factfinder should draw the inference that numerous county employees were awarded jobs as a result of having given $500 or more to the DiVecchio campaign, then it is incumbent upon Adams to point to evidence from which a factfinder can reasonably conclude:  (a) that a donation in the amount of $500 or more was actually given and (b) that there is a meaningful temporal connection between the donation and the employment decision such that a factfinder could infer both (i) DiVecchio's knowledge of the political contribution and (ii) DiVecchio's reliance on that contribution as a motivating factor.  Otherwise, only speculation -- as opposed to a reasonable inference of a politically discriminatory motive -- is possible.

Finally, Adams's theory that DiVecchio deliberately opened up non-union jobs for his political supporters by firing non-supporters must be considered in the light of DiVecchio's decision to hire or retain certain individuals with no obvious political connection to him or his campaign.  For example, we perceive no genuine dispute about the fact that DiVecchio, after assuming office as County Executive, retained Schenker's Director of Administration, Ann Bloxdorf, for a period of approximately six months until she took another job.  (See Knox Depo. at p. 62; Meredith Depo. at 113, 115.)  Nothing in this record suggests that Bloxdorf's departure was involuntary, nor is there any evidence to suggest that she was a DiVecchio supporter.

Similarly, DiVecchio retained Tom Lyons, Schenker's Director of Finance, for a period of approximately eighteen months until Lyons retired.  (Meredith Depo. at 113-

15.)  A woman by the name of Stephanie Freeman later assumed that job.  (Agresti Depo. at 28; Knox Depo. at 76.)  Again, however, there is no evidence of record to suggest that Lyons's retirement was influenced in any way by DiVecchio, nor is there any claim by Adams that either Lyons or Freeman had political ties to DiVecchio.

In his deposition, DiVecchio's Director of Personnel, Larry Meredith, testified to a number of other individuals whom DiVecchio retained from the Schenker Administration, including Margaret Stewart, Andy Glass, Mary Kwiatowski, and Charlie Barber. (Meredith Depo. at p. 113.)  Nothing in the present record substantiates an inference that these individuals contributed to, or were otherwise supportive of, DiVecchio's campaign.

Adams has also asked us to consider the termination of Ed Vereb, the Director of Maintenance, who allegedly was not a political supporter of DiVecchio and was terminated.  Vereb was apparently replaced as Maintenance Director by Michael Kraus, but we are aware of no evidence indicating that Kraus was a political supporter of DiVecchio.

In sum, the evidence which Adams has proffered in support of a broad-based "pay-to-play" patronage scheme is incapable of supporting a reasonable inference of political discrimination.  Most of the jobs in question appear to be inappropriate comparator jobs or are so far removed from Adams's own employment situation as to be of *de minimus* evidentiary value.  In addition, many of the alleged instances of "pay-to-play" are not documented in the record.  We therefore turn to the remainder of Adams's proffered evidence.

(vi)    The Alleged "Macing" by Rogan

Adams contends that he was the victim of a pattern of macing, which began no later than March 8, 2005, whereby DiVecchio directly, or through his supporters, pressured county employees to contribute $500 or more to his campaign.  (Pl.'s Statement of Material Fact [61] at ¶60, p. 10.)  As we have seen, Adams contends that he was twice approached during the latter part of 2005 by Rogan, DiVecchio's campaign treasurer, about purchasing tickets to fundraising events.  On September 24, 2005, Adams wrote a check in the amount of $50 for a ticket to an outdoor breakfast.  On December 16, 2005, he wrote a second check in the amount of $100 for a ticket to DiVecchio's inaugural ball.  In both cases, Adams made the checks out to Rogan personally rather than to the DiVecchio campaign.  Adams contends that these requests by Rogan fell within a general timeframe during which, particularly after the general election, Rogan made comments to Adams to the effect, "Don't you think you'd do well in private practice?" and "You're going to get to be retiring pretty soon."

This evidence, however, does little to advance Adams's theory that a political contribution of at least $500 was a quid-pro-quo for him keeping his job.  It is undisputed that Adams in fact made the contributions that were asked of him without expressing an objection to Rogan or anyone else.  He appears to have been credited for this donation by virtue of the campaign flier which listed him as one of the sponsors of a raffle for a 27-inch television and DVD.  He does not contend that Rogan ever asked for more than was given.  Still, Adams was terminated.  Furthermore, at least two other assistant public defenders -- Fryling and Heasley -- whose names appear on the flier alongside Adams were retained, despite the lack of any basis to conclude that they contributed

38

more than Adams to DiVecchio's campaign.  Consequently, this "macing" evidence does not logically support the inference that Adams was punished for insufficient political support.

Adams also refers to certain statements Rogan made concerning his employment status as evidence of political animus.  However, Rogan, as an investigator in the public defender's office, did not hold any supervisory power over Adams and was not personally in a position to affect the terms of his employment.  Although Rogan was DiVecchio's treasurer and may have held herself out as a person of importance, there is no evidence in this record to suggest that she actually possessed any influence vis-à-vis the decision-making process that led to Adams's termination.  In fact, Adams acknowledged as much at his deposition.  (Adams Depo. [62-1] at 234-35, 240.)

Insofar as a wide-spread pattern of "macing" is alleged, we note Adams's admission that he has no knowledge whether Weinraub or Clelland were ever approached by Rogan for campaign contributions.  While there is no evidence in the record to show that they ever contributed anything to DiVecchio's campaign, there is likewise no evidence to suggest that they were ever asked by Rogan (or anyone else) to do so.  Similarly, the Court is unaware of any evidence in the record indicating whether or not Attorneys Cauley, Allgeier, or Zak (the terminated OCY attorneys) were ever approached by DiVecchio, Rogan or another representative of the campaign concerning financial support.  Viewed vis-à-vis the entirety of undisputed evidence, Rogan's actions do not reasonably support the conclusion that DiVecchio was engaged in a wide-spread scheme to pressure prospective county employees for political contributions of at least $500.

39

(vii)   <u>Comments by Defendant Agresti</u>

Adams also points to certain comments made by Agresti following Adams'

termination and during the course of this litigation which, he believes, evidence a

politically discriminatory intent on the part of DiVecchio and/or Logue.  The first

comment occurredsometime in February or March of 2006 when Trooper Brown

inquired as to the reasons for Adams and Weinraub being fired and Agresti allegedly

replied, "Those guys should have known better.  You give $500.00 to each campaign

and cover your bases."

In the context of the entire record, we agree with Defendants that this comment

constitutes a stray remark which does little to advance Adams's theory.  First, as has

already been demonstrated, Agresti was not a decision-maker with respect to Adams's

termination specifically or with respect to the public defender's office at large.  Nor, for

that matter, does he appear to have been personally influential in any of the other

employment decisions within the DiVecchio Administration (aside from his own

acceptance of employment in the Office of Children and Youth and, later, the public

defender's office).  Moreover, in making this alleged comment, Agresti did not purport to

be representing the views of DiVecchio or Logue, the actual decision-makers.  At most,

the comments constitute a non-relevant opinion by a non-decisionmaker.

For much the same reasons, Agresti's comment to Adams's counsel ("Don't they

realize all the additional defendants there should be and I would add?") lacks

substantial probative value.  As Adams acknowledges, this statement was made in the

context of Agresti expressing irritation that the County had not yet at that point agreed to

handle his defense.  Agresti has testified that his comment was merely intended to

express his view that he had had no greater personal involvement or responsibility for

Adams's termination than any other member of the transition team would have had,

which is to say, none.  Strictly speaking, the statement is not an admission of liability;

while it suggests the involvement of other unspecified individuals, it does not speak to

the actual motives or illegality on the part of anyone in particular.  Viewed in the context

of the record as a whole, I find this alleged comment to be a stray remark that does not

advance Adams's First Amendment claim.

  (viii)  <u>Comments Made by Barry Grossman</u>

      As further proof that his termination was politically motivated, Adams has

submitted his own affidavit in which he alleges certain conduct and statements on the

part of Barry Grossman, DiVecchio's successor as County Executive.  According to

Adams's own affidavit [63-6], Grossman was Adams's "pre-law advisor and mentor"

during his college years.  (See Adams Affid. at ¶ 1.)  Adams suggests that Grossman, a

Democrat, had suspended his campaign shortly before the commencement of this

litigation but, after being informed by Adams a week later about the imminent filing of

this lawsuit and after the filing was reported in the local news, Grossman re-entered the

race.  (Id. at ¶¶ 3-5.)  During a televised debate, Grossman accused DiVecchio of the

sort of cronyism set forth in Adams's complaint and ultimately went on to defeat

DiVecchio in the Democratic primary and win the general election.  (Id. at ¶¶ 6-7.)  After

winning the election, Grossman fired Logue and publically emphasized that one of his

primary goals was to end the political cronyism that existed in the DiVecchio

Administration.  (Id. at ¶ 8.)  Thereafter, Grossman enacted a policy wherein

independent committees would evaluate job applicants.  After his first 100 days in office,

Grossman allegedly told local news outlets that his greatest achievement to date had been ending the use of cronyism in appointing county officials. (Id. at ¶ 9.) Based on the foregoing allegations, Adams contends that "Mr. Grossman is an attorney and scholar in the area of Constitutional Law" and "is qualified to be an expert witness for purposes of determining whether cronyism took place in the removal of the Plaintiff and the seven other employees fired by the Defendant." (Adams Affid. at ¶10.)

Defendants previously filed a motion to strike the affidavit [74] which this Court denied, indicating that we would independently evaluate the admissibility of the objected-to material in connection with our appraisal of the pending summary judgment motion. (See Order [83] entered 3/14/11.) Having done so, we agree with the Defendants that Adams's proffer concerning the relevance and use of this evidence is misguided.

For starters, Adams's affidavit fails to abide by the mandates of Rule 56, which requires that affidavits used to support or oppose a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). To the extent that Adams is attempting to use the statements of Barry Grossman on the subject of alleged cronyism within the DiVecchio campaign to establish the truth of that assertion, the statements constitute inadmissible hearsay. Grossman, for whatever reason, has not submitted an affidavit detailing his own prior statements or observations relative to the DiVecchio Administration's hiring practices.

Accordingly, Adams's attempt to introduce this evidence via his own second-hand observations violates the requirements of Rule 56.[11]

Moreover, Grossman cannot properly be certified as an expert witness in the area of "cronyism" under the Federal Rules of Evidence.  Rule 702 states that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Whether "cronyism" occurred within the DiVecchio Administration generally, or with respect to Adams's removal in particular, is not an issue involving "scientific, technical, or other specialized knowledge" as to which expert testimony is necessary in order to assist the trier of fact.  Nor is the fact that Grossman is a lawyer and served as Adams's pre-law advisor and mentor some thirty-five years ago sufficient to establish his credentials as a "scholar in the area of Constitutional Law."  (Adams Affid. at ¶ 10.)

---

[11]Adams maintains that any statements which Grossman made after assuming the office of County Executive should be considered binding admissions on the part of the County. See Fed. R. Evid. 801(d)(2) (admissions by a party opponent).  Adams does not contend – nor could he – that the statements attributable to Grossman are binding admissions as against DiVecchio or Logue. Nevertheless, Adams seeks to use his own proffer of Grossman's out-of-court statements, concerning alleged conduct on the part of DiVeccchio, to establish liability on the part of the County stemming from that same alleged conduct on the part of DiVecchio, even though such testimony would be inadmissible as against DiVecchio himself.  To construe Rule 801 in this fashion would, in effect, work an end-run around Rule 802, which generally bars hearsay testimony. In the context of this case, where it is not just the County which is named as a defendant, but also DiVecchio and Logue as well, this Court would be particularly disinclined to admit the evidence in its currently proffered form, especially given the vague nature of the statements attributed to Grossman and the lack of any direct connection between those statements and Adams's own termination.  Under the circumstances that exist here, whatever probative value there may be in Adams's own statements concerning Grossman's alleged statements about cronyism, such limited probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury.  See Fed. R. Evid. 403.

Although Grossman may be perfectly competent to testify to matters he personally witnessed in connection with his 2009 election to the office of County Executive, those observations do not necessarily qualify him as an expert on the topic of "cronyism" in general, much less do they qualify him to render a personal opinion on the motivations that underlay Adams's own termination – a decision in which he clearly had no personal involvement.

     (ix)    <u>The Alleged Payment to Oligery</u>

For what it's worth, we also acknowledge Adams's theory that DiVecchio won the 2005 general election as a result of an unlawful, purchased endorsement.  By way of relevant background, we note that Oligery was a candidate for County Executive in the 2005 Republican primary, which was ultimately won by Dale McBrier.  After McBrier defeated him in the primary, Oligery went on to endorse DiVecchio in the general election.

Adams has presented campaign records reflecting that, on October 20, 2006, almost one year after the general election, one of DiVecchio's fund-raising committees known as the "Friends of Mark DiVecchio" paid Agresti a lump sum of $5,000 in "consulting fees."  One week later, on October 27, 2006, Agresti contributed $5,000 to the "Committee to Elect Art Oligeri."  Adams contends that this shows DiVecchio, in effect, purchased Oligeri's political endorsement by arranging a $5,000 payment to Oligeri, through Agresti, which could be used by Oligeri to help retire his campaign debt.

Although we acknowledge Adams's evidence on this point, we find that it has no material bearing on the matters presently before this Court, as it has nothing to do with Adams's personal allegations of employment discrimination.

(x)   <u>Newspaper Articles from the Erie Times</u>

Finally, we acknowledge various news articles which Adams has submitted in opposition to the pending motion for summary judgment. These articles address a number of topics concerning Erie County politics during the years 1995 through 2009. Defendants contend that these articles are inadmissible hearsay and cannot properly be considered in connection with the pending motion.

We agree that the news articles are not, in their present form, reducible to admissible evidence and, therefore, they cannot properly be considered in conjunction with the pending summary judgment motion.  *See, e.g.,Jackson v. Light of Life Ministries, Inc.*, No. 2:05-CV-1779, 2006 WL 2974162 at *6 (W.D. Pa. Oct. 16, 2006) (a newspaper article is inadmissible hearsay and thus, cannot be considered in ruling on summary judgment) (*citing Barnes Foundation v. Township of Lower Merion*, 982 F. Supp. 970, 996 (E.D. Pa. 1997)).   Under Rule 807 of the Federal Rules of Evidence, evidence may be admitted under the "residual exception" to the hearsay rule if it has "equivalent circumstantial guarantees of trustworthiness" as those found in Rules 803 and 804 and if, among other things, "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."  Fed. R. Evid. 807.  Here, no showing has been made, and the Court does not find, that the newspaper articles in question are the best evidence that could be procured through reasonable efforts.  *Wright v. Montgomery County*, No. CIV, A 96-4597, 2002 WL 1060528 at *1 (E.D. Pa. May 20, 2002) (discussing the criteria for admission under the residual exception to the hearsay rule for statements having "equivalent circumstantial guarantees of trustworthiness" and explaining that

45

unsupported newspaper articles will normally fail to satisfy those criteria).  In any event, however, none of the subject matter set forth in the articles relates directly to Adams's termination.  For the foregoing reasons, the newspaper articles in question will not be considered in conjunction with this Court's ruling.

(x)   Conclusions About DiVecchio's Liability

To conclude, this Court has considered in depth each element of Adams's evidence insofar as it is claimed to reflect upon a discriminatory motive.  After careful review, I find that the evidence, both individually and collectively, fails to support a reasonable inference that political discrimination was a substantial or motivating factor on the part of DiVecchio insofar as Adams's termination is concerned.  Nor do I find sufficient evidence to warrant the inference that DiVecchio was aware of, and acquiesced in, a similar motive on the part of Logue, whom we discuss in more detail below.  Because the totality of evidence – even when viewed in the light most favorable to Adams -- fails to support a *prima facie* case of politically motivated discrimination, Adams's § 1983 claim against DiVecchio cannot withstand summary judgment.

c) *Defendant Logue*

We next consider the evidence as it pertains to Logue, who appears to have been the primary decision-maker with respect to Adams's termination.  To reiterate, the relevant inquiry here is whether Adams has produced evidence from which a jury could reasonably conclude that Adams's constitutionally protected activity served as a substantial or motivating factor in Logue's decision to appoint Pitonyak as First Assistant Public Defender.  In order to establish this *prima facie* prong, Adams must

demonstrate that a jury would be able to reasonably conclude from the evidence that Logue (a) knew about Adams's protected activity or status and (b) relied on that protected activity or status in making his decision. *Galli,* 490 F.3d at 275.

Viewing the evidence most favorably to Adams, we conclude that it fails to establish a viable *prima facie* case against Logue. To begin, the evidence fails to establish that Logue knew about Adams's non-support of DiVecchio which, Adams admits, he kept to himself. In fact, Adams had contributed (without objection) to DiVecchio's fundraising efforts when asked to do so and his name appeared as a sponsor on a DiVecchio fundraising flier. There is no evidence to suggest that Logue had access to, or ever reviewed or discussed with anyone, the campaign disclosure forms which provide the basis for Adams's "pay-to-play" theory.

Nor is there evidence from which a jury could reasonably find that Adams's non-support of DiVecchio served as a substantial or motivating factor in Logue's recommendation of Pitonyak in the First Assistant spot. The record is clear that Logue made no secret of his longtime desire to one day be appointed Chief Public Defender, and the testimony of Logue and Pitonyak suggests that the two men had talked over the years about Pitonyak becoming First Assistant if Logue ever became Chief Public Defender. Logue acknowledged as much at his deposition, when he agreed that "if [he] were named Public Defender, Mr. Pitonyak was going to be [his] First Assistant." (Logue Depo. [57-9] at 61-62.) According to Logue, he wanted Pitonyak for the First Assistant job because

> you run into a few people in your life that … you admire, that you trust. I've known Jim Pitonyak since 1977, know his work style, know his work ethic, know his habits as a man, as a good family man, and I respect him. And he knew what

we wanted to accomplish at the Public Defender's Office.  And so, it was just a natural selection.

(Logue Depo. at 53.)

Adams himself seems to suggest that Logue's decision to replace him with Pitonyak had more to do with Logue's own personal ambition and his friendship with Pitonyak than with concerns about political loyalty to DiVecchio.  Adams has described Pitonyak as a person "close to Mr. Logue" and whose "allegiance is with Mr. Logue."

(Adams Depo. at 225.)  He attributes his own firing to the fact that

> Mr. Logue saw me as the logical chief public defender because I had been working as a public defender longer, I had been a lawyer a lot longer, I have a much better legal reputation than he does, that, in fact, he saw me as the number one person that is in his way of obtaining a job that he had since gotten and subsequently altered to his financial betterment.

(Adams Depo. at [62-2] at 256.)  By terminating Adams's employment, Adams postulates, Logue was "not only eliminating a competitor, he [was] replacing the competitor with someone [i.e, Pitonyak] that he has a remarkably close personal relationship with."  (*Id*. at 257-58.)

Adams's *prima facie* case does not fare any better when we consider the evidence as it reflects on Logue's other employment-related decisions within the office.[12]  Although Adams has argued that Weinraub and Clelland were fired for failing to support DiVecchio's campaign, there is no evidence in this record which would suggest that Logue possessed knowledge about their political affiliation relative to DiVecchio.  Moreover, as we have previously discussed in detail, there were other attorneys within the office who kept their employment following Logue's appointment as

---

[12]There is no evidence to suggest that Logue had any influence on hiring decisions outside of the public defender's office, and the Court will limit its consideration of the evidence accordingly.

Chief Public Defender (e.g., Steven Lagner, Joseph Burt, Tina Fryling, Deanna

Heasley), or who were newly hired into the office under Logue (e.g., Bernie Hessley,

Michael DeJohn, Dave Ungerman), and no contention has been made (nor have we

found evidence to support the contention) that their employment was motivated by

support for DiVecchio.  Because the evidence fails to support a *prima facie* case of

political discrimination on the part of Logue, Adams's § 1983 claim against him cannot

survive.

## IV.   CONCLUSION

We have considered at length all of the evidence highlighted by Adams as

support for the theory that his own relative lack of political support for DiVecchio and/or

lack of political connections were a substantial or motivating factor in his termination.

To fairly evaluate the pending Rule 56 motion, we have examined each element of

Adams's proffer in light of the totality of other undisputed evidence, and in light of the

inferences Adams is seeking to establish, so as to separate the proverbial "wheat" from

the "chaff."

The ultimate issue, for purposes of our analysis, is whether the record before us

would permit a rational trier of fact to conclude that the relevant decision-makers knew

of Adams's protected political status and were motivated by it such that Adams's

protected political status served as a substantial or motivating factor in his discharge.

After careful consideration of the evidence, this Court finds that the proffered evidence,

even when construed most favorably to Adams, fails to support such a conclusion.

Accordingly, the Defendants are entitled to summary judgment on Adams's remaining

claim under 42 U.S.C. § 1983.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A.J. ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:07-cv-316-SJM |
| v. | ) | |
| | ) | |
| THE COUNTY OF ERIE, | ) | |
| PENNSYLVANIA, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER OF JUDGMENT

AND NOW, to wit, this 30th Day of September, 2011, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that the Defendants' motion for summary judgment [55] shall be, and hereby is, GRANTED.

Accordingly, as to the Plaintiff's remaining claim under 42 U.S.C. § 1983, JUDGMENT is hereby entered in favor of all Defendants and against Plaintiff A.J. Adams.

s/    Sean J. McLaughlin

Sean J. McLaughlin
United States District Judge

cm:    All counsel of record.